# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

JO ANNA DANIELS, )
 )
       Plaintiff, )
 )
v. ) Case No. CIV-07-430-KEW
 )
MICHAEL J. ASTRUE, )
Commissioner of Social )
Security Administration, )
 )
       Defendant. )

## OPINION AND ORDER

Plaintiff Jo Anna Daniels (the "Claimant") requests judicial review of the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Claimant's application for disability benefits under the Social Security Act. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, it is the finding of this Court that the Commissioner's decision should be and is REVERSED and REMANDED for further consideration.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . ." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social

Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . ." 42 U.S.C. §423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. *See*, 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal

---

Step one requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity (step one) or if the claimant's impairment is not medically severe (step two), disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to step four, where claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's step four burden is met, the burden shifts to the Commissioner to establish at step five that work exists in significant numbers in the national economy which the claimant – taking into account his age, education, work experience, and RFC – can perform. Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. *See generally*, Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988).

standards were applied. <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1164 (10th Cir. 1997)(citation omitted). The term "substantial evidence" has been interpreted by the United States Supreme Court to require "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). The court may not re-weigh the evidence nor substitute its discretion for that of the agency. <u>Casias v. Secretary of Health & Human Servs.</u>, 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the court must review the record as a whole, and the "substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); *see also*, <u>Casias</u>, 933 F.2d at 800-01.

### Claimant's Background

Claimant was born on November 24, 1963 was 43 years old at the time of the ALJ's decision. Claimant earned a GED. Claimant previously worked as a shipping receiver and as a utility worker at a tire plant. Claimant alleges an inability to work beginning April 26, 2004 due to degenerative disk disease of the lumbar spine and fibromyalgia.

## Procedural History

On August 12, 2004, Claimant protectively filed for disability benefits under Title II (42 U.S.C. § 401, *et seq.*) and for supplemental security income under Title XVI (42 U.S.C. § 1381, *et seq.*) of the Social Security Act. Claimant's application for benefits was denied initially and upon reconsideration. On February 7, 2007, Claimant appeared at a hearing before ALJ Kim Parrish in Ardmore, Oklahoma. On March 21, 2007, the ALJ issued an unfavorable decision, finding Claimant was not disabled during the relevant period. On October 15, 2007, the Appeals Council denied review of the decision. As a result, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He found that while Claimant suffered from severe impairments, they did not meet a listing and Claimant retained the residual functional capacity to perform light work that involves one to two step repetitive tasks.

## Errors Alleged for Review

Claimant asserts the ALJ committed error in failing to afford the opinion of Claimant's treating physicians the proper weight.

## Treating Physician's Opinions

Claimant first contends the ALJ failed to properly weigh the opinions of her treating physicians. On March 8, 2002, Claimant received treatment for pain on the left side of the mid-back. She was found to have a cyst at T8-T9. No obvious signs of neural root or spinal cord compression were noted. (Tr. 330-331).

Claimant received trigger point injections and rib block injections from Dr. Scott Mitchell on August 12, 2002. The injections gave little pain relief. Dr. Mitchell believed the muscle spasms Claimant was enduring were myofascial in nature. (Tr. 128). Botox injections appeared to offer Claimant relief. (Tr. 126). Because Claimant's pain continued down the left side and left leg, Claimant was referred to a rheumatologist for evaluation. (Tr. 126). Claimant's physician, Dr. James Forrestal suggested fibromyalgia as a possible cause for Claimant's pain. (Tr. 133).

Claimant was sent to Dr. Brian Shockey for evaluation for possible fibromyalgia. Dr. Shockey diagnosed Claimant with fibromyalgia, anemia, and neuralgia. He started Claimant on a new medication for the condition. (Tr. 357-58).

Claimant began seeing Dr. Craig Carson in November of 2002 at the Oklahoma Arthritis Center. Claimant stated she had all over body aches and muscle burning since 1991. She also wondered about

5

an antidepressant because she cries all of the time. Dr. Craig found Claimant had 18/18 tender points and scored 36 on the tender point index. He diagnosed Claimant with fibromyagia, secondary Sjogren's, depression, and irritable bowel syndrome. (Tr. 352).

On January 5, 2003, Claimant reported to the emergency room complaining of back spasms. She received medication. (Tr. 299).

On May 19, 2003, Claimant was attended by Dr. Craig. He continued to note trigger points and bursitis in Claimant's heel. He also diagnosed insomnia and noted that Claimant's depression and worsened. (Tr. 144-145).

Dr. Craig also completed a Medical Certification Form for Claimant's employer stating Claimant suffered from fibromyalgia and migraines since September of 2002. He stated Claimant needed extra rest and medication and that she might need time off for flare ups. He set forth that Claimant could not perform any work when she was experiencing a flare up. (Tr. 139). Dr. Craig completed another such form on August 22, 2003 for the United States Department of Labor. He stated Claimant suffered from fibromyalgia and would need time off work during a flare up. He did not know the frequency or duration of any such flare ups. He also states on the form that Claimant can do no work when a flare up occurs. (Tr. 136-138).

On August 22, 2003, Claimant underwent x-rays of her cervical,

thoracic, and lumbar spine, pelvis and feet and ankles. (Tr. 150-155). The x-rays showed mild spurring in the thoracic spine, a large heel spur in the left foot/ankle, and a small spur on the right foot/ankle. Mild arthritis was noted in the L5-S1 area. Id.

On August 27, 2003, Claimant saw Dr. Craig reporting she felt rotten and her muscles were causing her extreme pain. Dr. Craig prescribed pain and sleep medication. (Tr. 142).

Claimant began seeing Dr. Kent Smalley for pain management in January of 2004. He prescribed medication and referred Claimant for an MRI of her cervical spine. (Tr. 160-193).

The MRI revealed disk bulging at C4-C5 and at C5-C6 with minor space narrowing. Claimant was diagnosed with mild degenerative stenosis of the nerve root foramen. (Tr. 159, 166).

In March of 2004, Claimant again reported to the emergency room due to acute episodes of back pain and back spasms. (Tr. 257, 240-249). Claimant was referred to Dr. Jose A. Matus, a neurologist. Dr. Matus noted pain to palpation in Claimant's cervical area and pain with motion. He also found Claimant suffering from pain in the thoracic and lumbar regions. Claimant had difficulty walking on her heels due to spur formation. Dr. Matus diagnosed Claimant with diffuse chronic pain, possibly secondary to fibromyalgia. He also diagnosed Claimant with chronic headaches and low back pain due to disk disease. (Tr. 390-391).

7

Dr. Matus ordered an additional MRI of the lumbar spine and prescribed new medications. (Tr. 392).

On may 7, 2004, Claimant underwent another MRI. (Tr. 226). The testing revealed a protruding disk at L4-L5 with narrowing on the left side. Dr. Matus diagnosed fibromyalgia and slow back pain secondary to fibromyalgia and mild disk protrusion without radiculopathy. (Tr. 381-382).

On June 9, 2004, Claimant saw Dr. Matus complaining of cervical and back muscle pain. He diagnosed fibromyalgia, stable on medication, chronic pain syndrome, and disk protrusion at L4-L5 to the left. He prescribed new medications to Claimant for treatment. (Tr. 378-379).

Claimant continued suffering diffuse pain and sleeplessness through December of 2004, visiting both the emergency room and Dr. Matus several times. (Tr. 215, 223-224, 374-376).

On January 29, 2005, Claimant underwent an consultative examination with Dr. Baha Abu-Esheh. He diagnosed Claimant with hypertension, chronic pain all over her body, fibromyalgia, and possible degenerative disk disease in her neck. (Tr. 337).

Dr. Matus saw Claimant on February 23, 2005 with diffuse pain and weakness. Dr. Matus found Claimant to be suffering from fibromyalgia with persistent severe pain with minimal improvement and disk protrusion in the lumbar spine. (Tr. 365). On the same

date, Dr. Matus prepared a medical source statement in which he stated Claimant had severe limitations for obtaining a job position that would require repetitive lifting, pulling, pushing, sitting for long periods of time or standing. He opined Claimant was disabled because increased physical activity exacerbates Claimant's symptoms of pain. Dr. Matus also found Claimant has fatigability and "tiredness" problems. (Tr. 367).

On February 24, 2005, Claimant had a Physical Residual Functional Capacity Assessment form completed on her. While the examining party's signature is illegible, the form reflects an ability to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8 hour day, sit about 6 hours in an 8 hour day, and unlimited pushing and/or pulling. A review of Claimant's MRI revealed mild diffuse disk bulging at C4-C5 with no canal stenosis or mass effect on cord. Bulging was also found at C5-C6 with minor canal space narrowing. Mild degenerative stenosis of the nerve root foramen was also noted bilaterally at C5-C6. Claimant's grip was 5/5 and she was found to be able to do both gross and fine manipulation. Full range of motion was found in all extremities with some pain in the cervical spine and lumbar-sacral spine. Claimant's gait was safe and stable. (Tr. 344).

On April 27, 2005, Claimant again saw Dr. Matus, experiencing

increased spasms in her cervical and shoulder blade areas. Increased medications did not improve her condition. Dr. Matus noted some limitation of motion in Claimant's neck and upper back. He diagnosed Claimant with chronic pain syndrome secondary to fibromyalgia and disk protrusion. (Tr. 363).

On January 26, 2006, Claimant returned to Dr. Matus with chronic pain in her cervical and lumbar spine. She was also 6-7 weeks pregnant and was advised to stop taking her medication. Her pregnancy was designated high risk. (Tr. 414-415).

On April 12, 2007, Dr. Matus prepared a Medical Assessment of Ability to Do Work Related Activities (Physical) form on Claimant. He found Claimant could sit, stand, and walk no more than one hour in an 8 hour day, could not work an 8 hour day, could not lift, and could not push using her feet. Dr. Matus states Claimant "has chronic and severe pain cervical/thoracic and lumbar area."

In his decision, the ALJ found Claimant retained the residual functional capacity to perform light work on a regular and continuous basis. (Tr. 20). He found Claimant could lift a maximum of 20 pounds and occasionally lift or carry 10 pounds, anc could perform simple, unskilled 1-2 step repetitive tasks. Id. While the ALJ generally discussed the treatment records of Dr. Carson and Dr. Matus, he did not discuss their medical opinion statements and what weight their opinions were afforded, if any.

In deciding how much weight to give the opinion of a treating physician, an ALJ must first determine whether the opinion is entitled to "controlling weight." Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003). An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "consistent with other substantial evidence in the record." Id. (quotation omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." Id. (quotation omitted). The factors reference in that section are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support

or contradict the opinion. Id. at 1300-01 (quotation omitted). After considering these factors, the ALJ must "give good reasons" for the weight he ultimately assigns the opinion. 20 C.F.R. § 404.1527(d)(2); Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004)(citations omitted). Any such findings must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight." Id. "Finally, if the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." Watkins, 350 F.3d at 1301 (quotations omitted).

In this case, the ALJ failed to recognize the opinions of Claimant's treating physicians let alone engage in the weight analysis required by the prevailing authorities. Consequently, the case must be remanded for consideration of these medical opinions. The ALJ shall set forth the specific weight afforded these opinions and any reasons for giving them reduced weight and for accepting non-treating agency physician opinions over those of the treating physicians.

### Conclusion

The decision of the Commissioner is not supported by substantial evidence and the correct legal standards were not applied. Therefore, this Court finds the ruling of the

Commissioner of Social Security Administration should be and is **REVERSED and the matter REMANDED** for further proceedings consistent with this Order.

IT IS SO ORDERED this 30th day of March, 2009.

/s/ Kimberly E. West
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE